State v. Brunson

STATE OF NORTH CAROLINA v. JAMES ERNEST BRUNSON

No. 31

(Filed 15 May 1974)

1. **Criminal Law § 31— judicial notice of calendar**

    The law requires the courts to take judicial notice of the days, weeks, and months of the calendar.

2. **Criminal Law § 80— record entries of business or governmental agency — admissibility**

    If entries are made in the regular course of business at or near the time of the transaction involved and are authenticated by a witness who is familiar with them and the system under which they are made, the entries are admissible in evidence; the same rule applies to records of governmental agencies.

3. **Criminal Law § 80; Homicide § 20— school attendance record of defendant — admissibility**

    The trial court in a murder prosecution erred in refusing to permit the custodian of school attendance records to use the regular calendar for February 1972 and to point out to the jury the relation-

ship between the attendance record and the February calendar, since such testimony would have indicated that the attendance record showed defendant neither absent nor tardy on the day of the murder and would have been of probative value on a controverted issue of fact.

APPEAL by the defendant from *Braswell, J.,* October 22, 1973 Criminal Session, CUMBERLAND Superior Court.

The defendant, James Ernest Brunson, was charged by grand jury indictment with the murder of Vanessa Dale Lewis.

The evidence disclosed that Vanessa Dale Lewis, age nine years, at about 8:20 on the morning of February 22, 1972, passed the residence of Annie Houston, as was her custom, on the way to Walker Elementary School in Fayetteville. Usually she accompanied Mrs. Houston's children, but on that day they had already left and Vanessa followed, running in an effort to overtake them.

Mr. Marvin McGathy passed by his old, abandoned house located near the Walker Elementary School at about 9:00 a.m. He discovered Vanessa lying on the floor in a pool of blood, her clothes strown about the floor and her books and lunchbox nearby. She made a struggling sound. Two of her teeth were on the floor and her brain was exposed. Mr. McGathy notified the police. The ambulance took her to the hospital where she died a few minutes after arrival.

The pathologist, as a witness for the State, testified that Vanessa's skull was fractured and her brain exposed as a result of blows from a blunt instrument. Some of her teeth were missing. Three were removed from her stomach during the autopsy.

The officers received the call at 9:30 a.m. and reported to the scene where they released a bloodhound. The dog immediately set out on a trail and at a point about twenty-five yards from the house, the dog, leaving the trail, turned sharply to the right through underbrush for about twenty-five yards and stopped at a big bush. The officers found a hammer with fresh blood on it concealed in the bush.

Officer Newsom testified: "We made a door to door survey of every street in the immediate vicinity collecting the names . . . . I am not sure whether Robert Carmichael was talked to. In any event neither Robert Carmichael [State's witness] nor James Brunson [defendant] was charged until . . . like a year later."

State v. Brunson

Almost a year after the little girl's death, the officers (W. A. Newsom and Ray Davis) interrogated Robert Carmichael at the Cameron Morrison Training School for delinquents at Hoffman, North Carolina. "We related the facts of what we thought had happened to the little girl." The officers told him that James Brunson was pointing the finger at him. Thereafter, by questions, they obtained from Robert Carmichael a statement that on the morning of February 22, 1972, he and the defendant had planned to collect some copper wire to sell as they had done on a former occasion. They took a hammer from the toolbox belonging to Robert's father and went to a place near McGathy's abandoned house where the defendant first engaged Vanessa in conversation and then took her into the old house where he removed her clothes without any protest from her, attempted to have sexual intercourse with her, and finally struck her with the hammer a number of times. Thereafter, both the witness and Brunson went to the latter's home, washed away the blood that came from Vanessa's wounds, changed clothes, and went to school, arriving late. The foregoing story was repeated in substance at the trial of James Brunson for murder. The witness (Carmichael) admitted, "I got blood on me, on my pants and spots on my shirt. . . . We went from there to James' house. . . . After changing clothes, we went to school."

During the examination before the jury at Brunson's trial, the Assistant District Attorney made the following announcement for the State:

"I would state on behalf of the State in this case, that Mr. Lynn Johnson, Asst. Solicitor, or District Attorney, stated in open court in front of Judge Derb Carter, at the time of the juvenile hearing of this defendant and this witness, that the State granted complete immunity to this witness, that the State granted complete immunity to this witness for any acts which he observed and reported, which occurred on the 22nd day of February 1972 by Brunson and I believe Mr. Johnson stated by reason of the fact that his statement was exculpatory and was not admissible against him by reason of his not having a parent or guardian present."

On cross-examination, Robert Carmichael testified that when he was first questioned at the Training School, he told

the officers he did not know anything about Vanessa Dale Lewis' death.

> "I was under the impression that James Brunson had pointed the finger at me as being the one who killed Vanessa . . . I don't know whether I would have made the statement if I hadn't thought Brunson had pointed the finger at me as being the one who did it.

> "Q. . . . When you were under the impression that James Brunson had stated you killed Vanessa, you decided in your own mind you better tell that James Brunson was the one who did it, didn't you?

> "A. (No answer.)

> "Q. Isn't that right?

> "A. Something like that."

After obtaining the statements from Robert Carmichael, the officers secured a warrant charging James Brunson with the murder of Vanessa Lewis. They arrested him at the Stonewall Jackson Training School in Concord, North Carolina. A warrant was served on Robert Carmichael charging him with murder of Vanessa Lewis.

Officer Newsom testified that he told Brunson that Robert Carmichael had implicated him and that he might as well admit it. Officer Newsom said that the defendant said: "I did it. Prove it." However, on the way from Concord to Fayetteville the driver of the automobile (Officer Ray Davis) testified that he heard Officer Newsom interrogating the defendant, telling him that he might as well admit it that they had the evidence on him. He heard the defendant say, "Prove It."

The defendant in his own defense, testified that on the morning of February 22, 1972, he went to school and at about fifteen minutes before eight o'clock he, James Carmichael (Robert's brother), and Charles Davis played basketball until the school bell rang at eight-thirty and they went to their classes; that he knew nothing about Vanessa Lewis' death. Both James Carmichael and Charles Davis testified, corroborating the defendant's testimony. Each testified that the three played basketball and went from the basketball court to their classes.

The defendant called Mrs. Evelyn West who testified:

" . . . I am the custodian of the records of Fayetteville City Schools, . . . I have with me a photostatic copy of the attendance record of one James Brunson for February 22, 1972. . . . This is the record submitted to my office and is an official record of the school. This is complete from when he first enrolled in the city schools, the first grade.

"Q. Can you state what, if anything, the record indicates as to his school attendance on February 22, 1972?"

The State objected to the introduction of the attendance record. The court excused the jury and proceeded to conduct a voir dire.

"A. The record shows that he was enrolled on February 22, 1972.

"Q. Does it indicate whether or not he attended?

"A. Yes, he did attend school.

"Q. Does it indicate whether or not he was tardy on that date?

"A. No, sir.

"Q. Does it indicate he was tardy, or not tardy, or what?

"A. The system for keeping the record is, if they are not tardy, there is no entry; if they are tardy, we have a code number that we go by, showing if they are tardy or if they are absent.

\*　　\*　　\*　　\*

"A. In a school year, in lieu of having a three hundred and sixty-five day calendar, we go by a nine months period, which is a period of one hundred and eighty school days. In marking the school record, you go by the days, actual days that he attended.

\*　　\*　　\*　　\*

"Q. How do you determine which one is February 22, 1972?

"A. This is February 22nd. [indicating a space in the school record.]

"COURT: How do you know that, looking at that paper? Is there any way I could know that, by looking at that very paper itself?

"A. This is what I have; we have a calendar.

"COURT: You pick up another paper?

"A. Well, we have a calendar at school, which the bookkeeper makes at the beginning of each school month. The beginning of the sixth school month is marked on her large calendar, . . . So that would be this month right here, you see. . . .

"COURT: Doesn't that come out a different number from what you earlier testified?

"A. We could take out the Saturdays and Sundays; that is what you have to do, take out the number of Saturdays and Sundays within a period. [Saturdays and Sundays are not school days and, therefore, no record is kept.]

"COURT: Just a moment. I direct this question to the witness. Can any person, looking at this paper [school attendance record] that has now been marked Exhibit 2, find on that the calendar date February 22, 1972?

"A. If we have a seventy-two calendar, yes.

"COURT: I am not talking about a seventy-two calendar; I am talking about this exhibit. Does the date February 22, 1972 appear on that piece of paper anywhere?

"A. It does not except down here where Mr. Looper, in charge of the records department, has gone through there and gotten this information for me to present through the school calendar.

\*    \*    \*    \*

"COURT: I hold this record is not self-explanatory and takes interpolation from this document, to get the date of February 22, . . . The State's objection is sustained as to this witness."

The defendant excepted.

At the close of the evidence the court overruled the motion to dismiss and charged the jury without reference to the school attendance record or Mrs. West's testimony.

The jury returned a verdict of guilty of murder in the first degree. From the sentence of life imprisonment the defendant excepted and appealed.

*Robert Morgan, Attorney General by Thomas B. Wood, Assistant Attorney General, for the State.*

*Cherry & Grimes by Sol G. Cherry for defendant appellant.*

HIGGINS, Justice.

The first break in the solution of this case grew out of the interrogation of Robert Carmichael who was charged by warrant with the murder of Vanessa Lewis. The officers told Robert that James Brunson was pointing a finger at him. Robert then told the officers the story in substance as above recited. The interrogation of James Brunson brought his denial of any implication in or knowledge of the crimes committed against Vanessa Lewis. He claimed he was playing basketball and went from the basketball court to his classes at a time when it would have been impossible for him to have been present at the time the crimes were committed. James Carmichael and Charles Davis corroborated his story. They were testifying one year after the events. However, each said he remembered because he heard of Vanessa's death near the school on the day it occurred.

In this setting, the school attendance record of James Brunson on February 22, 1972, would be of material benefit to the defendant if it disclosed that on that day he was present at the school and not tardy. The discussion between the court and Mrs. West about the school attendance record discloses that she and the trial judge were communicating on different wave lengths. The school record showed a five day week. Hence, in order for the witness to identify February 22, 1972, on the school calendar, it was necessary for her to refer to the regular monthly calendar for that month. The first school day in the month of February, 1972, began on Tuesday. Omitting the Saturdays and Sundays (non-school days) the 22nd day of February was the 16th school day of that month.

The monthly school attendance record for each pupil was prepared by the school authorities and sent to the school at the beginning of the month. This record contained a space for each school day (omitting Saturdays, Sundays, and school holidays) to be filled in indicating whether the pupil was present, tardy, or absent. If the student was present and on time, the space on

the record was left unmarked; if tardy or absent, the proper mark so indicating was entered in the space for that day. A clean record indicated presence on time. To corrolate the school days as shown on the attendance record with the regular calendar days, required the examination of both the calendar and the attendance record. The comparison disclosed that February 22, 1972, was the sixteenth regular school day and the space for that day would indicate whether the defendant was present, tardy, or absent. If, however, as seems to have occurred in this case, the first *actual* school day in February, 1972, as explained by Mrs. West, was February 8th (indicating a midterm vacation of one week), then February 22nd would be the eleventh school day for the month.

Mrs. West testified the school attendance record for February, 1972, began on the 8th, indicating the first week was the midterm break. In that event, relating the school record to the regular calendar, February 22nd would be the eleventh school day; so that the record of James Brunson for February 22nd, assuming the week of vacation, would be contained in the eleventh space on the school record.

The trial judge excluded the school record because it was necessary for Mrs. West to check the regular calendar in order to relate the attendance record to that date. The court refused to permit Mrs. West to refer to the regular calendar or to testify to the jury about the record. The court ruled: "The State's objection is sustained as to this witness," the objection being that Mrs. West sought to correlate the school attendance record with the calendar.

[1] The law requires the courts to take judicial notice of the days, weeks, and months of the calendar. "The courts take judicial notice of the day of the week upon which any day of the month falls. . . . It is generally held that the courts are bound to take judicial notice of what days are legal holidays." 29 Am. Jur. 2d, Evidence, § 99, 130. *Smith v. Kinston,* 249 N.C. 160, 105 S.E. 2d 648; *Dowdy v. R. R.,* 237 N.C. 519, 75 S.E. 2d 639; *State v. Anderson,* 228 N.C. 720, 47 S.E. 2d 1; *State v. Vick,* 213 N.C. 235, 195 S.E. 779; 123 A.L.R. 1242.

"Courts will judicially notice the things properly belonging to an almanac. The courts take judicial notice of the calendar and of the periods within the calendar. They take judicial notice of the computation of time, the subdivision of the year into

months, weeks, and days, the days of the week, the order of suc-
ceeding days of the week, the number of days in a month, the
coincidence of days of the week with days of the month, and
of the days of the month with those of the year." 31A C.J.S.,
Evidence, § 100, 148-149. See also *State v. Anderson, supra.*

The defendant's school attendance record, a photostat of
which Mrs. West had with her in court, enabled her to identify
the defendant's attendance record showing that on February 22,
1972, he was neither absent nor tardy. The objections of the
trial judge indicate his view that the attendance record should
have been authenticated by the teacher who made it and not
by the official custodian of the attendance records for the entire
Fayetteville school system and that reference to the calendar was
impermissible.

There was a time, long ago, when the keeping of records
was simple and limited in scope. Now, almost every business or
governmental function is a matter of detailed record. Now rec-
ord keeping extends to all essential public, semi-public, and
private businesses. The value of these records arises from the
fact that they are made at the time when the events recorded
are fresh in the minds of the persons who made them. They are
intended to be a testimonial for future use. The larger the
scope of the business, the greater the need for permanent
records. An unreliable record would indicate a mistake or an
intent to deceive. As the practice of keeping records has ex-
panded, the courts more and more have liberalized the rules
governing their admission as evidence in court proceedings.
*Glenn v. Orr,* 96 N.C. 413, 2 S.E. 538; *Turnpike Co. v. M'Carson,*
18 N.C. 306.

In the landmark case of *Insurance Co. v. R. R.,* 138 N.C.
42, 50 S.E. 452, Justice Connor, speaking of book entries, said:
" 'Shall this proof be received, or shall the plaintiffs be com-
pelled to go behind the books thus verified by the clerks who
kept them, and resort to each of the subagents who participated
in the transaction and sale of this produce? Are not the entries
thus made in the usual course of business of this extensive trad-
ing establishment, and as a part of the proper employment of
the witnesses who prove them, not only the best, but the only
reliable evidence which it is practicable to procure?' "

[2]  In the Brandis Revision of Stansbury's North Carolina
Evidence, § 155, this appears: "If the entries were made in the

regular course of business, at or near the time of the transaction involved, and are authenticated by a witness who is familiar with them and the system under which they were made, they are admissible."

The rule with respect to entries in the course of business applies to governmental agencies. "Operations of instrumentalities of government including federal, state, and county agencies, constitute 'business' within statute permitting admission of records made in the regular course of business. *La Porte v. U.S.*, C.A. Cal., 300 F. 2d 878, 880.

\*    \*    \*    \*

"The word 'business' . . . whether in form of an entry in a book or otherwise . . . is admissible in proof thereof, if made in regular course of any 'business,' includes business, profession, occupation and calling of every kind. *Snyder v. Cearfoss*, 57 A. 2d 786, 790, 190 Md. 151." 5A Words and Phrases, "Business," at 663.

Defendant's attendance record, Exhibit 2, does not appear in the case on appeal. This Court of its own motion issued a writ of certiorari directing that the superior court certify Exhibit 2 as a part of our record. The Superior Court of Cumberland County answered the writ saying the exhibit was not allowed in evidence and was not in possession of the court.

The discussion between the court and Mrs. West was on the voir dire at the conclusion of which the court stated: "The State's objection is sustained as to this witness [Mrs. West]." The ruling is challenged by Exception No. 6 and discussed in the brief as Assignment of Error 6.

[3] Obviously, the school attendance record made at the time showing that James Brunson was neither absent nor tardy, but was present in school on the morning of February 22, 1972, would be of probative value on a controverted issue of fact. The court should have permitted the custodian of the attendance records to use the regular calendar for February, 1972, and to point out to the jury the relationship between the attendance record and the February calendar, indicating that the attendance record showed the defendant neither absent nor tardy on that critical day.

The exclusion of that record was prejudicial error. The Court orders that there be a

New trial.